

## NUMBER 13-05-00281-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

---

**DANA CORPORATION,** **Appellant,**

**v.**

**MICROTHERM, INC. AND**
**DAVID E. SEITZ, INDIVIDUALLY,** **Appellees.**

---

On appeal from the 357th District Court
of Cameron County, Texas.

---

## MEMORANDUM OPINION ON REHEARING

**Before Justices Yañez, Rodriguez, and Benavides**
**Memorandum Opinion on Rehearing by Justice Rodriguez**

After considering the motion for rehearing filed by appellee/cross-appellant, Microtherm, Inc., we deny the motion; however, we withdraw our opinion and judgment of August 31, 2009, and substitute the following.

Microtherm manufactured and sold the Seisco® electric tankless water heater. Microtherm bought thermistors, component parts used in its water heaters, from appellant/cross-appellee, Dana Corporation (Dana).[1] Complaining that the thermistors failed, Microtherm filed suit against Dana.[2] Appellee/cross-appellant, David E. Seitz, the owner and chief executive officer of Microtherm, also filed suit against Dana in his individual capacity as inventor and owner of patents relating to the Seisco technology.[3]

After a trial on the merits, a jury found, among other things, that Dana knowingly violated the Texas Deceptive Trade Practices Act (DTPA). The trial court entered judgment on the verdict in favor of Microtherm and against Dana. The judgment awarded actual and additional damages, pre-judgment and post-judgment interest, and attorneys' fees. Dana appeals the trial court's judgment.

By five issues with multiple sub-issues, Dana challenges each of the jury's liability and damage findings, the trial court's award of attorneys' fees, and the trial court's refusal to include certain jury charge damage instructions. On cross-appeal, Seitz contends that we should reinstate his individual claims because the trial court erred in rendering a take-

---

[1]Throughout the record, thermistors are also referred to as "temperature senders" and "temperature sensors." For ease of reference, we will refer to these component parts as thermistors.

[2]Maid Maquiladora, S.A., was originally named as a plaintiff but ultimately non-suited its claims after the plaintiffs rested their case.

[3]Microtherm and Seitz sued other component parts manufacturers, including Puget Plastics Corporation (Puget), United Plastics Group (UPG), and Emerson Electric Co. (Emerson). Puget and UPG made plastic chambers for Microtherm's water heater during the relevant time period. Emerson manufactured the heating element used in the water heater.

Before trial, the court rendered summary judgment in favor of these defendants and against Seitz on his individual claims. Seitz does not appeal that judgment. Emerson settled with Microtherm before the trial began, and the jury found in favor of Microtherm and against Puget and UPG. Although Puget and UPG filed notices of appeal, they requested, and this Court granted, dismissal of their notices because they had settled post-judgment. Therefore, Puget, UPG, and Emerson are not parties to this appeal.

2

nothing judgment against him. We affirm in part, affirm, as modified, in part, and reverse and remand in part.

## I. Factual Background

The Seisco water heater is tankless. It uses electronically-controlled elements to heat water as the water flows through the chamber. The Seisco's primary component parts include the following:

(1)    the chambers: each heater has two or four small, resin water chambers, manufactured with DuPont's Zytel resin;

(2)    the heating element: each chamber has a heating element that is screwed into the chamber part;

(3)    thermistors: each chamber also has thermistors which provide a temperature measurement; and

(4)    the circuit or control board: each water heater has a circuit board to interpret sensor readings and regulate temperature.

In 1999 and 2000, various component parts of the Seisco water heater—including plastic chambers manufactured by Puget Plastics Corporation (Puget) and then by United Plastics Group (UPG), heating elements manufactured by Emerson Electric Co. (Emerson), and thermistors made by Dana—began to fail. Various component parts continued to fail through 2002.

Relevant to Microtherm's claims against Dana, in 1989, Microtherm's predecessor began purchasing thermistors from General Automotive Specialties, a company that was sold to another company which later became Dana. Some thermistor failures occurred from 1989 to 1999. In 2000, Dana replaced approximately 400 thermistors. In August 2000, Microtherm contacted Dana to discuss the problem it was having with the thermistors. In response, Dana initiated an investigation.

3

On January 15, 2001, Dana issued an 8-D corrective action report, which described the problem as follows:  "Resistors are drifting in resistance.  The customer must turn the screw terminals for the thermistors to stay in line."  The report also identified the "root cause" to be that the "[t]hermistors are out of spec" (contributing 85% to the malfunction) and "[h]ousing and thermistor [are] contaminated" (contributing 15% to the malfunction).  Dana sent the report to Microtherm.  To contain the problem, Dana's report recommended that, effective January 4, 2001, Microtherm "send back all bad thermisters [sic] to the supplier.  Request a new shipment of thermisters [sic] within spec as soon as possible to met [sic] production schedule.  Issue a Quality Alert Notice to the test station and process inspection to check for drifting thermistors."  As a permanent corrective action, the report recommended the following:  (1) inspecting all thermistors before assembly and checking their resistance at room temperature, at 100 degrees and at 220 degrees Fahrenheit; (2) cleaning the thermistors with very fine sandpaper and washing with alcohol; (3) cleaning inside the housing to eliminate probable contamination; and (4) updating the process sheets to reflect the corrective action implemented January 15, 2001.  This permanent corrective action was to be effective with the next production schedule.  Luis Sada, a quality control engineer identified in the January 15 8-D corrective action report, was one of the persons responsible for verifying that the permanent corrective action was implemented.

Between January and April 2001, the thermistors continued to fail.[4]  Sada issued a quality control report dated April 11, 2001, again addressing Microtherm's November 7,

---

[4]Seitz testified that Microtherm replaced "over almost [sic] 500" thermistors in 2001.

2000 complaint. Dana did not send the April 2001 report to Seitz. Seitz's talks with Dana after April 2001 were not productive, leading Microtherm, in late 2001, to terminate its relationship with Dana.

## II.  Procedural Background

### A.  Microtherm's Claims

Microtherm sued Dana, Puget, and UPG alleging breach of express and implied warranties through the DTPA, other DTPA laundry-list and unconscionability violations, fraud, and negligent misrepresentation. Microtherm sought lost profits, lost business value, and repair costs.  Microtherm claimed that defective component parts resulted in water heater failures that caused customers to stop buying the Seisco water heater, which in turn caused Microtherm to lose profits and the company to lose value.

Following a four-week trial, the jury found all trial defendants liable for each DTPA breach of warranty, laundry-list violation, and unconscionable act.  It found that the DTPA violations, unconscionable actions, and breaches of warranty were committed "knowingly." The jury also held the trial defendants liable for fraud and negligent misrepresentation.

As instructed by the trial court and over Microtherm's objection, the jury made damages findings on a defendant-by-defendant divisible basis.  Based on its affirmative DTPA findings, the jury found damages against Dana as follows:  (1) $200,000 for the cost to repair and/or replace the failed thermistors; (b) $12,400,000 in lost profits; and (c) $15,000,000 for the loss to the value of Microtherm.[5]  It also found that $250,000 should

---

[5]In addition, the jury found that Puget breached warranties and violated the deceptive trade practices act (DTPA) and Microtherm sustained damages as follows:  (1) $175,000 for the cost to repair and/or replace the failed plastic chambers; (b) $7,340,000 in lost profits; and (c) $15,000,000 for the loss in value.  As against UPG, the jury found the same violations and breaches and awarded Microtherm the following damages:  (a) $100,000 for the cost to repair and/or replace the failed plastic chambers; (b) $5,850,000 in lost profits; and

5

be awarded to Microtherm against Dana because the conduct was committed knowingly.[6] In addition, the jury awarded actual damages totaling $1,500,000 and exemplary damages totaling $330,000 on Microtherm's fraud claim against Dana.[7] Microtherm, however, elected to recover under the DTPA claims, not the fraud claim. No damages were awarded for negligent misrepresentation. Finally, the trial court's judgment awarded attorneys' fees against Dana in the amount of $12,463,485.[8] It also awarded pre-judgment and post-judgment interest.

## B. Seitz's Individual Claims

Seitz claimed that he was entitled to individual recovery on his claims for breach of warranty, DTPA, and negligence against Dana. He asserted that, because of the failures resulting from defective component parts, he had lost patent royalties and valuable patent rights. At the close of the plaintiffs' case, the trial court directed a verdict in Dana's favor on Seitz's individual claims.

## III. Challenges to Liability Findings

In its first issue, Dana generally contends that it is not liable to Microtherm under any theory of recovery. By numerous sub-issues, Dana attacks each of the jury's liability

---

(c) $11,500,000 for lost value. The total amounts awarded on the breach of warranty and DTPA claims as against Dana, Puget, and UPG, were repair and/or replacement costs for the failed parts in the amount of $475,000, lost profits in the amount of $25,590,000, lost business value in the amount of $41,500,000, and attorneys' fees in the amount of $30,348,628.

[6]Concluding the conduct was committed knowingly, the jury also awarded Microtherm $400,000 as against Puget and $600,000 as against UPG.

[7]The jury awarded actual and exemplary fraud damages totaling $4,330,000 against Puget and $3,180,000 against UPG on Microtherm's fraud claim.

[8]In addition to pre-judgment and post-judgment interest, the trial court also ordered that Microtherm recover attorneys' fees from Puget in the amount of $10,309,088 and from UPG in the amount of $7,576,055.

6

findings, asserting that (1) the jury's DTPA breach of warranty findings are immaterial and supported by insufficient evidence; (2) the DTPA laundry-list and unconscionable conduct findings are immaterial and supported by insufficient evidence; (3) there is no evidence to support the jury's "knowingly" findings; and (4) if reached, the jury's fraud findings will not support a judgment. Because Dana addresses the jury's breach of warranty findings first on appeal, we begin with those findings.

## A. Threshold Issue: Limitation of Liability

The jury found Dana breached both express and implied warranties under the DTPA. Before reviewing the jury's findings, however, we must consider a threshold question—whether Dana limited its liability as to all breach of warranty claims. Dana argues that Microtherm cannot escape damage limitations because Dana provided Microtherm with invoices for the thermistors sold to Microtherm, invoices that contained limitation of liability provisions.[9] It is undisputed, however, that the limitation provisions were found on the back side of Dana's invoices, and Microtherm claims that Dana failed to prove that Microtherm received the back side of the invoices.

## 1. Applicable Law

The sale of thermistors, a sale of goods, is subject to the warranty provisions of chapter 2 of the Texas Business and Commerce Code (the UCC). *See PPG Indus. v. JMB/Houston Ctrs. Ltd. P'ship*, 146 S.W.3d 79, 83 & n.4 (Tex. 2004) (citing TEX. BUS. & COM. CODE ANN. § 2.102 (Vernon 2009) (providing that the chapter applies to transactions in goods)). "Chapter 17 of the same [c]ode (the DTPA) allows consumers to bring breach

---

[9]It is undisputed that the contract or series of contracts in this case were, in fact, numerous invoices reflecting thermistors Dana sold to Microtherm.

7

of warranty claims under that chapter as well." *Id.* at 83 & n.5 (citing TEX. BUS. & COM. CODE ANN. § 17.50(a) (Vernon Supp. 2008) (providing that consumers "may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish: . . . (2) breach of an express or implied warranty")).

The UCC also provides that damages for breach by either party may be limited by agreement. *Materials Mktg. Corp. v. Spencer*, 40 S.W.3d 172, 176 (Tex. App.–Texarkana 2001, no pet.) (providing that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable"); *see* TEX. BUS. & COMM. CODE ANN. §§ 2.718, 2.719 (Vernon 2009) (allowing for liquidation or limitation of damages by agreement). Because an action for breach of warranty is not a creation of the DTPA, limitation of damages under the UCC applies to contract claims and to warranty claims made pursuant to the DTPA. *See Sw. Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 576-77 (Tex. 1991); *Spencer*, 40 S.W.3d at 176.

"This [limitation] provision presumes[, however,] that both parties are aware of the limitation of damages." *Spencer*, 40 S.W.3d at 176 (explaining that the limitation on which MMC relied was on the back of its preprinted invoice sent to a third party, not to the Spencers, and MMC had no evidence that it notified the Spencers of the limitation of damages or that the Spencers were aware that the invoice had a back side). Moreover, "[f]orcing a limitation on a party without . . . knowledge or even consultation would go against the general policy behind the DTPA." *Id.* (citing TEX. BUS. & COM. CODE ANN. § 17.44 (Vernon 2002) (providing that the DTPA shall be liberally construed and applied "to promote its underlying purposes, which are to protect consumers against false, misleading,

and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection")).

## 2. Invoice Limitation Provisions

On the back side of the invoices at issue in this case, set off by the heading "DEFECTIVE MERCHANDISE," Dana provided that, at its option, it would "replace merchandise without charge or allow credit for merchandise found, after inspection, to be defective due to workmanship or materials."  In a section titled "LIMITATIONS OF LIABILITY," the following paragraph excluded liability for consequential and exemplary damages, including claims for lost profits or revenues:

> (A)    DANA WILL NOT UNDER ANY CIRCUMSTANCES, WHETHER AS A RESULT OF BREACH OF CONTRACT, BREACH OF WARRANTY, TORT OR OTHERWISE BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL OR EXEMPLARY DAMAGES including, but not limited to loss of profits or revenues, loss of use of or damage to any associated equipment, cost of capital, cost of substitute products, facilities or services, down-time costs, or claims of Buyer's customers.

This section also included the following paragraph which limited liability to the price of the product or shipment involved:

> (B)    DANA'S LIABILITY ON ANY CLAIM OF ANY KIND FOR ANY LOSS OR DAMAGE ARISING OUT OF, RESULTING FROM, OR CONCERNING ANY ASPECT OF THIS AGREEMENT OR FROM THE PRODUCTS OR SERVICES FURNISHED HEREUNDER SHALL NOT EXCEED THE PRICE OF THE SPECIFIC PRODUCT OR SHIPMENT WHICH GIVES RISE TO THE CLAIM.

## 3. Receipt of Back Side of Invoice

Relevant to our analysis is the undisputed fact that the limitations to which Dana refers were printed on the back of a two-sided invoice.  To support its contention that

9

Microtherm received copies of both sides of the invoices, Dana relies on the testimony provided by Carmine Auditore, plant manager of Candidos Universales in Matamoros, Mexico, where the thermistors were assembled. Auditore agreed that invoices in a multiple set of carbons were generated at the plant. He explained that Dana retained a green-colored invoice copy in its files at the plant and "[t]he white copy [was] the original invoice that [went] directly to the client, in this case Microtherm. . . . The invoice [was] always sent to the sold[-]to party. The product would be sent to the ship[-]to party." Auditore testified that the invoice would have been sent to Microtherm, 223 West Air Tex, Houston, TX 77090.

However, the only two-sided invoices admitted at trial were the green-colored invoices kept by Dana. Any invoices sent to Microtherm would have been white, not green. Copies of the white two-sided invoices, which Dana claimed would have been sent to Microtherm, are not in the record. At trial, Microtherm introduced faxed copies of the front side of some invoices which were copies produced by Dana during discovery. The faxed copies were of the front side only and did not have a back side that contained the limitation language.

We cannot conclude that the exhibits at trial and Auditore's testimony established that Microtherm received the back side of the white copy of the invoice. Our conclusion is supported by the trial testimony of Seitz, who—after being asked on cross-examination to read part (A) of the limitations-of-liability paragraph on the back side of Dana's invoice and agree that it was essentially the same warranty Microtherm made in regard to the thermistors in its water heaters—responded, "I have not seen this. I don't know. I have not seen this document." Acknowledging that he did not handle the invoices personally,

Seitz also testified that when his office received the invoices, he "suspected" that his office knew they were from Dana because of Dana's logo that appeared on the upper left-hand side of the front side of the invoice. There is no evidence that Microtherm received the back side of the invoices.

### 4. Acceptance of Additional Terms

Dana also contends that the sales invoices, which included Dana's terms and conditions of sale, were its confirmations and acceptances of Microtherm's offers. *See* TEX. BUS. & COM. CODE ANN. § 2.207 (Vernon 2009) ("a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon"). Dana asserts, pursuant to section 2.207, that, through the invoices, the liability limitations became a part of the parties' contract. *See id.* However, we have already determined that there was no written confirmation of the terms and conditions at issue because there is no proof that Microtherm received the back side of the invoices. Therefore, this argument fails.

### 5. Course of Conduct

In addition, Dana argues that because Microtherm accepted the goods, consistently paid for the thermistors with checks that referenced the some twenty invoices for over three years, and neither objected to nor questioned Dana's liability limitations, Microtherm, through its course of conduct, accepted the limitation-of-damages terms. As support for this argument, Dana refers this Court to *Tubelite, a Division of Indal, Inc. v. Risica and Sons, Inc.* and *Asgrow Seed Company v. Gulick*, 420 S.W.2d 438, 441 (Tex. App.–San Antonio writ ref'd n.r.e., 1967).

11

In *Tubelite*, the Texas Supreme Court considered "whether post[-]contract[-] formation conduct of the parties [was] sufficient to modify the terms of the agreement to include payment of late charges." 819 S.W.2d at 804. After the written offer and acceptance had occurred, Tubelite added a late charge to the statements sent to Risica. *Id.* at 802. It was undisputed that Risica received the statements of account. *Id.* Risica, while not formally objecting to these charges, made five partial payments, none of which exceeded the principal amount due. *Id.* at 805. The supreme court acknowledged that, "[a]cquiescence to the contract by the party to be charged may be implied from his affirmative actions, such as when he continues to order and accept goods with the knowledge that a service charge is being imposed and pays the charge without timely objection." *Id.* It then held that "Risica's failure to formally object to the unilateral addition of a late charge will not support a finding of implied modification of the existing contract." *Id.*

Unlike *Tubelite*, we are addressing contract formation, not modification. There is no evidence to establish that Microtherm received the limitation-of-damages provisions on the back side of the invoices. Thus, we would conclude that Microtherm's receipt of the thermistors was no evidence of an agreement to limit damages or of a mutual intention to modify the contract to include the limitation of damages provisions. *See id.* And without more, Microtherm's failure to object to the provisions does not establish an agreement to limit damages between the parties. *See id.*

Likewise, we cannot conclude that *Asgrow* provides support for Dana's contention that Microtherm, through its course of conduct, accepted the limitation-of-damages terms.

12

*See* 420 S.W.2d at 441-42. The Asgrow parties engaged in a series of commercial transactions with the Gulik parties, each time using the same forms with the same limitations of liability arising from the sale of seeds. *Id.* at 441. Based in part upon testimony that "the same limitation of warranty and liability had been on the shipping instructions and invoices delivered to appellees on the previous purchases," the San Antonio Court found that those contractual limitations were incorporated by implication into the contract. *Id.* at 442. The Gulicks signed the shipping instructions, and the invoices covering all the seed purchased were mailed to the Gulicks. *See id.* at 441. The issue of whether the Gulick parties had knowledge of the limitation provisions, however, was never raised in *Asgrow*. Unlike the present case, it is apparent that both parties in *Asgrow* recognized the limitations of warranty and liability provisions contained on the shipping instructions and invoices. *See id.* at 441-44.

Dana also notes that the checks issued by Microtherm to pay for each invoice specifically referenced Dana's invoice number. Dana argues that absent receipt of the double-sided, white-colored invoices, Microtherm would have had no source for these invoice numbers. However, our review of the invoices in the record reveal that the invoice number is on the front side of the invoice. Thus, we are not persuaded by this argument.

### 6. No Jury Question on Actual Knowledge

Although Dana requested a question on Microtherm's actual knowledge of its disclaimer of warranties, Dana did not seek a jury question on whether Microtherm had actual knowledge of its limitation of liability provision through receipt of the back side of the invoice or otherwise, and Dana did not object to the lack thereof. Therefore, there was no jury finding on Microtherm's actual knowledge of the asserted limitations.

13

### 7. Conspicuousness

Finally, Dana asserts that the limitation provision, found on the back of the invoice, is conspicuous as a matter of law because it is referred to on the front of the invoice. *See* TEX. BUS. & COM. CODE ANN. § 1.201(10) (Vernon 2009). We disagree.

Assuming that conspicuousness applies to a limitation provision as it does to a disclaimer of warranty provision, "[t]he conspicuous requirement mandates 'that something must appear on the face of the [contract] to attract the attention of a reasonable person when he looks at it.'" *Dresser Indus. v. Page Petroleum*, 853 S.W.2d 505, 508 (Tex. 1993) (quoting *Ling & Co. v. Trinity Sav. & Loan Ass'n*, 482 S.W.2d 841, 843 (Tex. 1972)); *see Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex. 2004). The following statement appears on the bottom left-hand corner on the front of the invoice, printed in the same font and size as all other information on the front of the invoice: "REFER TO REVERSE SIDE FOR TERMS AND CONDITIONS OF SALE." We cannot conclude, without more, that this statement would attract the attention of a reasonable person and suggest to that person that there is a limitation of liability provision on the reverse side. *See Dresser Indus.*, 853 S.W.2d at 508. Therefore, this argument fails.

### 8. Conclusion Regarding Limitations of Liability

We conclude, therefore, that Dana did not limit its liability for damages. The record does not support a conclusion that Microtherm received and accepted, through its course of conduct, or otherwise, the limitation-of-liability provisions which were found on the back side of Dana's invoices. Accordingly, we overrule this limitation sub-issue in Dana's first issue.

14

## B. Evidentiary Issues on Producing Cause

By a sub-issue in its first issue and by its second issue, Dana generally complains that the evidence of causation is insufficient to support the verdict. Having concluded that liability limitations do not apply to Microtherm's DTPA breach of warranty claims, we first address Dana's evidentiary challenges as they apply to the breach of warranty findings.

Jury question 3 asked, "Was the failure, if any, of any defendant . . . to comply with a warranty made, if any, a producing cause of damages to Microtherm[?]" Among other breaches, the jury found that Dana failed to comply with an express warranty which was a producing cause of damages to Microtherm. *See* TEX. BUS. & COM. CODE ANN. § 17.50(a)(2) (providing that a consumer may maintain an action where a breach of an express warranty constitutes a producing cause of economic damages); *see also id.* § 2.313(a)(1), (b) (Vernon 2009) (providing that an express warranty is "any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" and "[i]t is not necessary . . . that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty").

The jury charge defined "producing cause" as "an efficient, exciting, or contributing cause that, in a natural sequence, produced the damages, if any. There may be more than one producing cause." Under producing cause, the plaintiff must prove "actual causation in fact." *Prudential Ins. Co. v. Jefferson Assoc., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995). Proof of causation-in-fact "requires proof that an act or omission was a substantial factor in bringing about an injury which would not otherwise have occurred." *Id.*

15

By its first issue, Dana generally contends that even if its liability is not limited, there is no evidence that its breach of, or failure to comply with, an express warranty was a producing cause of damages. In its second issue, Dana contends that Microtherm failed to prove that Dana's conduct was a cause-in-fact of its lost profits or loss of value—that Dana's conduct was a substantial factor in bringing about an injury which would not otherwise have occurred.

"An express warranty is created when a seller makes an affirmation of fact or a promise to the purchaser that relates to the sale and warrants a conformity to the affirmation as promised." *Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731, 746 (Tex. App.–Fort Worth 2005, pet. denied) (citing *Humble Nat'l Bank v. DCV, Inc.*, 933 S.W.2d 224, 233 (Tex. App.–Houston [14th Dist.] 1996, writ denied)). "[W]hen a party fails to deliver the goods as promised, a breach of contract occurs, but when a seller delivers nonconforming goods, it is a breach of warranty." *Id.* at 747 (citing *Ellis v. Precision Engine Rebuilders Inc.*, 68 S.W.3d 894, 897 (Tex. App.–Houston [1st Dist.] 2002, no pet.)). "[T]here are no true DTPA warranties, nor does the DTPA define the term 'warranty.' To be actionable under the DTPA, a warranty must be established 'independently of the act.'" *Humble Nat'l Bank*, 933 S.W.2d at 231 (citing *Enterprise-Laredo Assoc. v. Hachar's Inc.*, 839 S.W.2d 822, 830 (Tex. App.–San Antonio 1992), writ denied per curiam, 843 S.W.2d 476 (Tex. 1992) (quoting *La Sara Grain Co. v. First Nat'l Bank*, 673 S.W.2d 558, 565 (Tex. 1984))).

In this case, Dana does not dispute that it provided an express warranty set out in its sales invoices—that it would provide thermistors to Microtherm free from defects in

16

materials and workmanship. *See Head*, 159 S.W.3d at 746 (citing *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 438 (Tex. 1995) (holding that warranties actionable under the DTPA, both express and implied, must first be recognized by common law or created by statute)). Dana made an affirmation of fact to Microtherm that related to the sale of the thermistors and warranted a conformity to the affirmation as promised. *See id.* Dana does not challenge the sufficiency of the evidence to prove that it failed to comply with its express warranty. Therefore, our review of this breach of warranty finding will be limited to Dana's evidentiary challenges to the producing cause element. Moreover, although Dana contends the evidence is legally and factually insufficient, it argues only that there is no producing cause evidence to support the verdict—a legal sufficiency argument. Therefore, we construe this evidentiary issue as a legal sufficiency challenge.

## 1. Standard of Review

When reviewing a record for legal sufficiency where the opposing party has the burden of proof, we view the evidence in the light most favorable to the verdict to determine whether the evidence at trial would allow reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We "must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* We will sustain a challenge to the legal sufficiency of evidence only if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Id.* at 810.

17

More than a scintilla of evidence exists, and the evidence is thus legally sufficient, if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence. *Lee Lewis Constr. Co. v. Harrison*, 70 S.W.3d 778, 782-83 (Tex. 2001). However, "when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

## 2. Expert's Testimony on Causation Challenged

Dana first challenges the testimony of Elizabeth Trillo, Ph.D., Microtherm's expert, as unreliable. Dana argues that because Trillo's testimony is incompetent and there is no other reliable expert testimony, there is no evidence of causation.

> An expert's testimony, to be admissible, must possess a reliable foundation. *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006). . . . Expert testimony is unreliable if it is based on unreliable data, or if the expert draws conclusions from his underlying data "based on flawed methodology." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997).

*Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 39 (Tex. 2007). Under *Havner*, a party may complain on appeal that scientific evidence is unreliable and constitutes no evidence to support a judgment. *See* 953 S.W.2d at 711.

## a. Other Causes of Contamination

As to producing cause, Trillo testified that contamination of the thermistor could have occurred during the thermistor's assembly process. Dana complains that Trillo's opinion is unreliable because she failed to rule out other causes of contamination,

18

specifically a breach of the brass casing that housed the thermistors. Dana asserts that, because Trillo undertook no testing to rule out this possible source of contamination, her testimony is unreliable—that it is too unsophisticated to be reliable. *See Emmett Props., Inc. v. Halliburton Energy Servs., Inc.*, 167 S.W.3d 365, 373 (Tex. App.–Houston [14th Dist.] 2005, pet. denied) ("An expert's failure to rule out other causes of the damage renders his opinion little more than speculation and therefore, unreliable."); *see also Havner*, 953 S.W.2d at 720 ("[I]f there are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty."); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 559 (Tex. 1995) ("An expert who is trying to find a cause of something should carefully consider alternative causes.").

In a draft report, Trillo opined that contamination could have occurred during assembly (manufacturing process); however, she also concluded that "[c]ontamination could also have been due to a failure of the brass casing of the sender assembly. Under normal operating conditions, the inside components are isolated from the environment, however, if there is a breach in the brass casing, contaminants could have been introduced inside the sender." In this earlier report, Trillo did not say which possibility was more likely.

At trial, Trillo testified that her draft report mentioned that the casing may have been breached. She testified that, after discussions with Seitz where he indicated to her that there were no reports of failures solely due to the casing—"that he never saw any failures, cracking or otherwise, of the brass casing"—and after examining the springs, she determined that breach of a casing was not a cause of the failures. Therefore, she decided to remove that portion of her report. Trillo explained that if the housing had been

19

breached, the water would have laid along the bottom level resulting in a corrosion line along the bottom of the spring and through the entire length of the spring. Her inspection revealed that there was an absence of a trail of corrosion along the entire length of the spring.

Although Trillo did not test the casings using electro microscopy, as did Dana's expert, she did examine the casings and the springs and ruled out breach of a casing as a cause of the failures.[10] Trillo did not provide a "bare opinion"; this was not solely a "subjective interpretation of the facts." *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 906 (Tex. 2004) (explaining that "[a]n expert's bare opinion will not suffice" and is unreliable if "based solely upon his subjective interpretation of the facts"). Thus, we cannot conclude that Trillo's opinion was unreliable on this basis.[11]

### b. Sample Size and Extrapolation Testimony

Trillo examined five thermistors. One thermistor that had not failed was used as a "control."[12] Of the four remaining thermistors, three had failed and one had not. Dana contends that Trillo's testimony was unreliable because her sample was too small and because she provided no foundation for her extrapolation of the failure of three thermistors to all failed thermistors Dana provided to Microtherm, other than her *ipse dixit*. *See Earle*

---

[10]Although Trillo did not use scientific testing to rule out a possible seal breach as a cause of the failures, Trillo testified that she did not consider the seals as a source of failure because she did not observe any seal breaches or any contaminants on the seals.

[11]After Trillo spoke to Seitz, she deleted this conclusion from her report. Dana contends that Trillo removed the conclusion because Seitz asked her to do so and argues that her abandonment of her own opinion at the direction of the client bears the indicia of untrustworthiness. This, however, is a factor for the jury to consider in determining the credibility of the expert's testimony. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995) ("[T]he jury will continue to assess the weight and credibility of the [expert's] proffered testimony.").

[12]Trillo testified that the control thermistor had been placed in service in 1997.

20

*v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999) ("An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts.").

Trillo's work did not, however, consist only of the examination of five thermistors and Trillo's *ipse dixit*, as Dana suggests. Trillo testified that her methodology included (1) asking questions of Seitz and looking at customer warranty records to understand the history of the problem including the timing of the failures and their numbers;[13] (2) reviewing a photograph of a sensor that Dana's expert had cut apart and noting an extensive amount of rust and red colored deposits that came from the inside of that thermistor; (3) performing a visual observation of the outside of the sensors; (4) sectioning some of the sensors so that she could remove the inside components—including a spring, a thermistor, a plastic sleeve that holds the spring in place, and a rubber O-ring on the backside; (5) performing an SEM (scanning electron microscope) analysis on several springs;[14] and (6) reviewing Sada's deposition transcript, which included his April 2001 quality control inspection report in which Sada "reported that [sic] contaminants throughout the process line in the assembly of the sensors on most of the parts" and indicated that the problem had not been resolved by April 2001. Based on the above, Trillo testified that she stated in her report "that the springs of the sensors had failed due to rust or oxidation process due to contaminants that were found in the housing. And it is the most likely cause that the

[13]Trillo testified that the history was important because it "indicated that the rate of failure increased after a certain period of time, so there must have been something that occurred in 1999 and forward that would cause the failures to occur, an increased number of failures to occur."

[14]Trillo explained that the results showed that those springs that came from the failed sensors had a large amount of red deposits or rust on the ends of the spring. The control did not have any iron oxide or rust.

contaminants were present during assembly."  At trial, Trillo testified that she provided the most likely cause or mode of failure in her investigation and that "[l]ooking at a small sampling of failures and the manner in which [she] did is acceptable."

Moreover, we are neither persuaded nor bound by the authority upon which Dana relies for the proposition that Trillo's sample size was too small.  *See Minnesota Mining & Mfg. Co. v. Atterbury*, 978 S.W.2d 183, 192-93 (Tex. App.–Texarkana 1998, pet. denied) (discussing the precedent on expert witness testimony in silicone cases including *Kelley v. Am. Heyer-Shulte Corp.*, 957 F. Supp. 873, 879 (W.D. Tex. 1997), where the federal court excluded an expert witness because her conclusions were based only on unreliable studies, one of which was unreliable due to, among other things, its small sample size of 445); *Mitchell Energy Co. v. Bartlett*, 958 S.W.2d 430, 446-48 (Tex. App.–Fort Worth 1997, pet. denied) (concluding that test results which showed hydrogen sulfide present in two of the wells on a single day and absent a month later, was no more than a scintilla of evidence, and, thus, legally insufficient to establish causation).  Trillo's opinion regarding causation was not based solely on an unreliable study of another or on a bare conclusion alone without supporting facts.  *See Atterbury*, 978 S.W.3d at 192-93; *Mitchell Energy*, 958 S.W.2d at 447 (citing *Havner*, 953 S.W.2d at 711).  Her conclusion was based on historical facts, photographs of testing performed by Dana's expert, her own thermistor tests, and Sada's deposition testimony and his April 2001 report.

Therefore, we cannot conclude that Trillo's opinion regarding the failure of the thermistors was unreliable because her sample was small.  Neither can we conclude that her opinion was unreliable because her extrapolation of the failure of the five sampled

22

thermistors to all failed thermistors was without foundation.[15]

### 3.  No Other Evidence of Causation

Dana argues that, without Trillo's testimony, there is no evidence to support the findings that Dana's breach of its express warranty was a producing cause of Microtherm's damages.  Having determined that Trillo's testimony is reliable, this contention fails.

Nonetheless, there is also evidence that Dana's own January 2001 8-D corrective action report found that the thermistors were contaminated and "out of spec," and Sada's internal April 2001 report reflects continued contamination problems during the assembly process.  In addition, Seitz testified that "[t]he sensors stopped giving reliable temperature measurement and so the heaters failed."

Referring to the above reports, Dana argues that Microtherm's causation case cannot rest on Dana's own reports and internal evaluations and policies to substitute for the needed expert testimony.  However, the cases relied upon by Dana, *FFE Transportation Services, Inc. v. Fulgham* and *Fenely v. Hospice in the Pines*, do not support this proposition.  They provide only that a company's self-imposed policies do not establish the standard of care and cannot be substituted as the industry's standard of care in determining a breach.  *See FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 92-93 (Tex. 2003); *Fenely v. Hospice in the Pines*, 4 S.W.3d 476, 481 (Tex. App.–Beaumont 1999, pet. denied).

---

[15]Dana also appears to suggest that Trillo, who agreed that she was not qualified to perform a statistical analysis, attempted to do so in an effort to support her extrapolation.  This argument, however, is without merit because, even if we were to agree that Trillo provided such testimony, the trial court, at defense counsel's request, instructed the jury to disregard that testimony.  Dana does not complain on appeal that the jury disregarded the trial court's instruction.

In this case, Trillo did not use Dana's self-imposed policies, reports, and internal evaluations to establish the standard of care. She did not substitute Dana's quality control reports for the industry's standard. Trillo provided expert testimony on causation. She reviewed Dana's own reports on quality control and its internal evaluations and used information from the reports to provide support for her opinion on causation. Neither case relied upon by Dana addresses the application of internal reports, evaluations, and policies to a determination of causation. Neither case supports a conclusion that Microtherm's expert cannot consider Dana's 8-D correction report or the April quality control report in arriving at an opinion on causation. Whether or not corrective actions were taken at Dana's assembly plant pursuant to a company policy which did or did not exceed the existing standard of care, the evidence established there was contamination in the assembly of the thermistors, which according to Trillo, was a producing cause of the failure of the thermistor.

### 4. Contrary Evidence

After contending Microtherm did not prove that Dana's act or omission was a substantial factor in bringing about an injury which otherwise would not have occurred, Dana appears to raise a *City of Keller* challenge. *See* 168 S.W.3d at 827. Dana generally asserts that, to the contrary, the evidence shows that even after installation in Microtherm's water heaters, the temperature senders were easily replaced. Without citation to the record, Dana urges that there is other contrary evidence showing that: (1) a failure of a temperature sender did not cause any other damage to the user's property, and (2) Microtherm had significant failures in other components—and had called damages flowing from the other components "irreparable." In our legal sufficiency review, however, we

24

cannot conclude that this alleged contrary evidence could not have been disregarded by reasonable jurors in determining whether Dana's act or omission was a substantial factor in bringing about an injury which would not otherwise have occurred.  *See id.*

### 5.  Conclusion Regarding Producing Cause

Therefore, viewing the evidence in the light most favorable to the verdict, and crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not, we conclude that there was more than a scintilla of evidence to establish producing cause.  *See id.* at 810, 823; *Harrison*, 70 S.W.3d at 782-83.  The evidence was legally sufficient to establish that Dana's breach of express warranty was a producing cause of Microtherm's damages—Dana's act or omission was a substantial factor in bringing about an injury which would not otherwise have occurred. We overrule Dana's sub-issue in its first issue and Dana's second issue challenging the legal sufficiency of the evidence to support the verdict.

### C.  Evidentiary Challenge to "Knowingly" Finding

In its first issue, Dana contends, by a sub-issue, that there is no evidence that Dana knowingly supplied defective thermistors to Microtherm.  Dana asserts that the evidence is not sufficient to show that Dana had actual awareness that it was supplying defective thermistors to Microtherm.

In response to question 5, the jury found that Dana's failure to comply with its express warranty was committed knowingly.  In relevant part, the charge defined "knowingly" as "actual awareness of the conduct constituting a failure to comply with a warranty" and instructed the jury that "[a]ctual awareness may be inferred where objective

25

manifestations indicate that a person acted with actual awareness."[16]  *See* TEX. BUS. &

COM. CODE ANN. § 17.45(9) (Vernon Supp. 2008); *see id.* § 17.50(a)(2); *K.C. Roofing Co.*

*v. Abundis*, 940 S.W.2d 375, 377 (Tex. App.–San Antonio 1997, writ denied) (noting actual

awareness may be inferred from the surrounding circumstances).  "The burden is on the

plaintiff to prove that the defendant acted knowingly." *CA Partners v. Spears*, 274 S.W.3d

51, 74-75 (Tex. App.–Houston [14th Dist.] 2008, pet. denied).

Although Dana asserts that there is no evidence that it knowingly supplied defective

thermistors to Microtherm, we conclude that the following evidence supports the

"knowingly" finding:

- Seitz testified that early in November 2000 Microtherm informed Dana of the problems that Microtherm was seeing with the thermistors.

- Sada, one of Dana's quality control engineers, confirmed that Dana received Microtherm's complaint and informed Microtherm that a product engineer was evaluating the sample and the reported problem and was exploring, among other things, possible contamination of the thermistor.

- In January 2001, Dana communicated to Seitz, verbally and through a January 1, 2001 8-D Correction Action report, that it had reviewed the thermistor sent to Dana by Microtherm and was going to correct the problems at their facility with respect to contamination on the thermistors.

- The January 8-D corrective action report found the "root cause" of the defect to be that the sensors were "out of spec" and the housing and thermistor were contaminated.  To contain the problem it was recommended that, effective January 4, 2001, all bad thermistors be sent back to the supplier with a request for immediate corrective action, that a new shipment of thermistors "within spec" be sent as soon as possible to meet the production schedule, and that a new Quality Alert Notice be sent for the test station and process inspection to check for drifting thermistors.  To correct the problem, the report recommended the following:  (1)

---

[16]The DTPA provides for the award of additional damages for statutory violations that are committed "knowingly."  *See* TEX. BUS. & COM. CODE § 17.50(b)(1) (Vernon Supp. 2008).  Having found Dana knowingly failed to comply with its express warranty, the jury awarded $250,000 additional damages to Microtherm and against Dana.

inspecting all thermistors before assembly and checking their resistance; (2) cleaning the thermistors with sandpaper and alcohol; (3) cleaning inside the housing; and (4) updating the process sheets to reflect the new requirements for the thermistor check. This permanent corrective action was to be effective with the "next production schedule."

• Sada testified that on April 11, 2001, as instructed by Teresa Salazar, Dana's quality manager and the person to whom Sada reported, he submitted a report regarding Microtherm's complaint. Sada also testified that he had inspected the assembly line and noted that component parts were stored in open places where there was dirt and filth, that assemblers were not using latex gloves to prevent the transfer of contaminants from their hands to the finished product, and that the conditions that existed on the assembly lines could allow these thermistors or their component parts to be contaminated by oil, dust, dirt, humidity, oxidation, or other particles. In the April report, Sada made several recommendations to provide better control of the cleaning operation to prevent contamination which he believed was the most probable cause of the failures—"loose contacts due to contaminants between the thermistor and the bottom of the housing, or between the terminal or the spring due to defects in the parts material or finish."

• Sada also indicated in his report that on April 9, 2001, he had run a test with 25 sensors with the housings previously cleaned very carefully using q-tips and the thermistor cleaned with a clean cloth and found all samples to be within specification at ambient and at 220°F. Angelica Lopez believed that a 100 piece run would be more representative and could provide better results. She was going to request authorization to build 100 pieces with extreme precautions of cleaning the housing and thermistor. At the time of Sada's report, Lopez had not built the samples.

• Sada testified that he sent his report to Salazar, but did nothing to solve these problems. He did not implement any procedures to correct what he saw when he observed the people on the assembly line.

• Seitz testified that Sada indicated Dana "really never did what they said they were going to do to correct or attempt to correct the problem." Seitz testified that despite the January 1, 2001 and April 11, 2001 reports which showed contamination as the most probable cause of the failures, Dana did not fix any of the problems.

• In August 2001, Seitz informed Carmine Auditore, the manager at Dana's plant where the thermistors were assembled, about failures that were occurring with the thermistors.

• Auditore acknowledged that he may have read Sada's April 2001 report and set it aside or filed it. But that did not mean that he would remember it.

- Auditore also testified that it was possible that he did not read the January 2001 report. The first time he recalled reading the report was after Seitz called him in August 2001, and they discussed that issue—eight months after the January report was issued and four months after the April report was issued. He believed that things were being done correctly, even based on April report.

- Dana's summary of sales to Microtherm from January 1, 2000, through June 12, 2002, admitted as plaintiff's exhibit 12.13, showed that Dana continued to sell thermistors to Microtherm throughout 2001, including 3000 thermistors on April 19, 2001, 3000 on May 4, 2001, 2500 on July 7, 2001, and 2000 on October 5, 2001.

Based on the above, we conclude that the record contains some evidence that Dana knowingly engaged in conduct that breached the express warranty. *City of Keller*, 168 S.W.3d at 827; *Harrison*, 70 S.W.3d at 782-83. Dana knew it had warranted that the thermistors would be free from defects. Seitz's testimony establishes that he engaged in conversations with Dana in November 2000 discussing failures in thermistors that Dana provided. Through its January report, Dana confirmed that Microtherm had reported defects in the thermistors—that the "[t]hermistors [would] not stay in line or drift." Dana told Seitz, through the January 2001 report and through verbal communication, that it was going to correct the problems at its facility with respect to contamination on the thermistors. Dana's January 2001 report and its April 2001 report noted that contamination was apparent in the samples tested and, in the April 2001 report, that problems still existed at the assembly plant.

However, Sada testified that, although he provided his manager with his April report, he did not follow-up on his recommendations. Apparently, no further testing was done although Sada reported in April 2001 that cleaner assembly of twenty-five thermistors resulted in a product that was in spec and that further inspection of a larger sample was suggested. Dana did not provide Sada's April 2001 report to Microtherm. Seitz also

28

testified that Sada indicated that Dana "really never did what they said they were going to do to correct or attempt to correct the problem." In August 2001, Seitz talked with Auditore about the failures occurring with the thermistors. Auditore testified that he did not read the reports or did not remember them and that his plant was fine even before the April report was issued. Dana continued to supply thermistors to Microtherm until October 2001; the thermistors were assembled under conditions that apparently had not changed.

From the evidence, the jury could have concluded that after November 2000, Dana was aware its thermistors were contaminated and failed to provide proper resistance. The jury could have inferred that Dana continued to supply defective thermistors to Microtherm knowing that the problems with their assembly had not been corrected. A reasonable fact finder could infer from the objective manifestations and surrounding circumstances that Dana continued to provide thermistors with "actual awareness" that the thermistors were defective. Therefore, viewing the evidence in the light most favorable to the verdict, we conclude the evidence is legally sufficient to support the jury's finding that Dana knowingly failed to comply with its express warranty. *City of Keller*, 168 S.W.3d at 827. We overrule Dana's sub-issue in its first issue that challenges the jury's knowingly finding.

Because we conclude that the judgment can be sustained on Microtherm's breach of warranty theory, we need not address Dana's challenges to the jury's remaining DTPA liability findings.[17] They are not dispositive of this appeal. *See* TEX. R. APP. P. 47.1.

---

[17]Relying on *Crawford v. Ace Sign*, Dana also contends that the gravamen of Microtherm's complaints is breach of contract or breach of warranty, not DTPA laundry list violations or unconscionable acts. 917 S.W.2d 12, 12-13 (Tex. 1996) (per curiam). Having determined the jury's finding on breach of express warranty under the DTPA supports liability, we need not reach this contention. *See* TEX. R. APP. P. 47.1.

## IV. Challenges to Damage Findings

After finding that Dana, Puget, and UPG failed to comply with their respective warranties, the jury was asked to determine what sum of money from each of the defendants would compensate Microtherm for its damages that resulted from the conduct. The charge instructed the jury to consider, among others, (1) lost profits sustained in the past and, in reasonable probability, will be sustained in the future; and (2) damage, if any, to the value of Microtherm. As to each element, the jury was instructed to answer *separately* in dollars and cents, if any, for Dana, Puget, and UPG. The jury awarded *divisible damages* for lost profits, past and future, in the amount of $12,400,000 against Dana, $7,340,000 against Puget, and $5,850,000 against UPG and *divisible damages* for lost value in the amount of $15,000,000 against Dana, $15,000,000 against Puget, and $11,500,000 against UPG.

## A. Divisible or Indivisible Damages

Before considering Dana's evidentiary challenges to the DTPA damages awarded against it, we must address a threshold argument raised by Microtherm. By what we construe as a cross-issue, Microtherm contends that the trial court erred in determining that the damages were divisible rather than indivisible.[18] Microtherm asserts that "it is clear that the losses sustained by Microtherm are precisely the type of indivisible injuries that, under Texas law, would give rise to joint and several liability," and "[g]iven the timing of the Dana failures, which occurred in both 2000 and 2001, there can be no doubt but that

---

[18]The term "indivisible injury" means an injury which from its nature cannot be apportioned with reasonable certainty to the individual wrongdoers. *Amstadt v. U. S. Brass Corp.*, 919 S.W.2d 644, 654 (Tex. 1996) (citing *Landers v. E. Tex. Salt Water Disposal Co.*, 248 S.W.2d 731, 734 (Tex. 1952)). If a plaintiff's injuries are indivisible, defendants are jointly and severally liable for the whole amount if they fail to meet their burden to prove any apportionment of liability for the plaintiff's injuries. *Id.*; *Landers*, 248 S.W.2d at 734.

30

Microtherm's damages are indivisible as between Dana, on the one hand, and Emerson, Puget, and/or UPG, on the other hand." Microtherm argues that "[t]he trial court's 'divisibility' ruling, *i.e.*, that Microtherm had to prove damages severally as to each defendant, is patently wrong." In response, Dana contends that because Microtherm moved to enter judgment on the verdict and proposed that it recover on the basis of the divisible damages awarded, Microtherm may not take this inconsistent position on appeal. We agree.

Before the jury trial began, the court ruled that damages were divisible.[19] At the end of Microtherm's case, the trial court directed a verdict that the parties were responsible only for damages, if any, caused by their own conduct. Consistent with the trial court's rulings, the charge submitted divisible damage questions.[20] Although Microtherm took the position throughout trial that its damages were indivisible, after receiving a favorable verdict from the jury on its DTPA claims, Microtherm filed an amended motion for entry of judgment asking the trial court to "enter Final Judgment" and "to sign and enter the proposed Final Judgment" that was attached to its motion as Exhibit A.

In its amended motion, Microtherm specifically, and importantly, provided that its proposed final judgment reflected "the findings of the jury and the application of appropriate statutory and common law authority." It then set out the following:

---

[19]During pre-trial proceedings, the trial court granted summary judgment ordering "that [Microtherm] shall not be entitled to pursue a theory of joint and several liability among the defendants; rather [Microtherm] shall be required to prove causation and damages separately . . . ."

[20]At the charge conference, Microtherm again asserted its position that the damages were indivisible, requesting a question on indivisible damages. The trial court refused this question and submitted divisible damage questions.

However, your Plaintiff disagrees with some of the findings of the jury, specifically in their responses to Question 18, and feel[s] there is a fatal defect in this response which will support a judgment notwithstanding the verdict.[21] Your Plaintiff prays this Court enter the judgment. Plaintiff agree[s] only to the form of the judgment but disagree[s] with the content and result of a portion of the judgment and state[s] nothing herein acts as a waiver of the plaintiffs to complain about the judgment in post-Judgment Motions and appeal.

All jury questions and answers were made part of Microtherm's proposed judgment attached to its motion,[22] including the divisible damage questions and answers.

Microtherm also proposed the following decretal language in its recommended judgment:

It is ordered, adjudged and decreed that . . . Microtherm shall recover from . . . Dana . . . the sum of Twenty Seven Million Six Hundred Thousand and No/100 Dollars ($27,600,000.00) actual damages for violation of the Texas Deceptive Trade Practices Act and Two Hundred Fifty Thousand and no/100 Dollars ($250,000.00) as additional damages for knowingly committing a violation of the Texas Deceptive Trade Practices Act.

Microtherm's proposed judgment further set out that it shall be awarded, as against Dana, pre-judgment interest in the amount of $3,308,465.75 and post-judgment interest at the rate of 5% per annum from the date of the judgment until the judgment is paid.

The trial court entered final judgment based on Microtherm's proposed judgment. The final judgment includes the same divisible damage questions and jury answers. The final judgment awards identical divisible damages against Dana in the amount of $27,600,000 in actual damages and $250,000 as additional damages. Similarly, the

---

[21]Question 18 asked if Arctic Slope was responsible for Puget's conduct. The jury responded that it was not.

[22]In its proposed final judgment, Microtherm inserted a paragraph after question 18 requesting that the trial court grant its motion for judgment notwithstanding the verdict and disregard the jury's negative findings in answer to question 18. However, the trial court struck the request from the proposed judgment and initialed the change. The trial court included question 18 in its final judgment.

judgment awards $3,308,712.33 as pre-judgment interest on past actual damages of $27,200,000 and post-judgment interest at the rate of 5% per annum until the judgment is paid.

When a party moves for entry of judgment, and the trial court enters the judgment, the party cannot later complain of that judgment. *Casu v. Marathon Ref. Co.*, 896 S.W.2d S.W.3d 388, 389 (Tex. App.–Houston [1st Dist.] 1995, writ denied); *see Litton Indus. Prods., Inc. v. Gammage*, 668 S.W.2d 319, 322 (Tex. 1984) ("We disapprove a practice by which a party, by motion, induces the trial court on the one hand to render a judgment, but reserves in a brief the right for the movant to attack the judgment if the court grants the motion."); *JCW Elecs., Inc. v. Garza*, 176 S.W.3d 618, 628 (Tex. App.–Corpus Christi 2005), *rev'd on other grounds,* 257 S.W.3d 701 (Tex. 2008) ("The general rule is that when a party files a motion for entry of judgment, that party cannot take a position on appeal that is inconsistent with that part of the judgment."); *accord Ne. Tex. Motor Lines, Inc. v. Hodges*, 138 Tex. 280, 158 S.W.2d 487, 488 (Tex. 1942) (explaining that because a party presented two charge issues together, it cannot be heard to complain that court chose the issue that was more onerous to it and concluding that "a litigant cannot ask something of a court and then complain that the court committed error in giving it to him. The rule, grounded in even justice and dictated by common sense, is that he is estopped."); *D/FW Commercial Roofing Co. v. Mehra*, 854 S.W.2d 182, 190 (Tex. App.–Dallas 1993, no writ) (holding that the plaintiff waived a complaint regarding the amount awarded as attorneys' fees where the plaintiff filed a motion to enter judgment and the trial court entered judgment for the exact sum requested by the plaintiff in the motion); *cf. Miner-Dederick*

33

*Const. Corp. v. Mid-Cty Rental Serv. Inc.*, 603 S.W.2d 193, 198 (Tex. 1980) (holding that an appellee moving for judgment on one interpretation of jury's findings was entitled to complain that findings based on another interpretation were against the preponderance of the evidence); *Green v. Tex. Workers' Comp. Inc. Facility*, 993 S.W.2d 839, 843-44 (Tex. App.–Austin 1999, pet. denied) (concluding that a plaintiff moving for judgment on the jury's verdict on the basis that he was entitled to lifetime medical benefits did not waive a challenge to the jury's failure to find any partial or total incapacity as a result of that occupational disease). Moreover, "where the litigant moves the trial court to enter a judgment, and the trial court enters the judgment, the litigant cannot later complain of that judgment, period." *Casu*, 896 S.W.3d at 391 (citing *Transmission Exch., Inc. v. Long*, 821 S.W.2d 265, 275 (Tex. App.–Houston [1st Dist.] 1991, writ denied) (holding that cross-appellant waived its point of error concerning a duty to mitigate by moving for entry of the final judgment that the court entered). "To preserve the right to complain about a judgment on appeal, a movant for judgment should state in its motion to enter judgment that it agrees only with the form of the judgment, and note its disagreement with the content and result of the judgment." *Id.* at 390 (citing *First Nat. Bank of Beeville v. Fojtik*, 775 S.W.2d 632, 633 (Tex. 1989) (per curiam)).

On rehearing, Microtherm asserts that its amended motion for entry of judgment contained a reservation of Microtherm's right to complain about the judgment on appeal. However, in its amended motion, Microtherm expressly made the following unqualified request: "Your Plaintiff requests this Honorable Court sign and enter the Final Judgment attached to this Motion as Exhibit 'A' as it reflects the findings of the jury and the application of appropriate statutory and common law authority." Having made this request

34

for entry of judgment, Microtherm specifically disagreed with the jury's affirmative finding in response to question 18. Disagreeing with no other jury finding, Microtherm again asked for entry of its proposed judgment stating, "Your Plaintiff prays this Court enter the Judgment." Microtherm then recited that it agreed "only to the form of the judgment" but disagreed "with the content and result of *a portion of the judgment*" and stated that nothing acted "as a waiver of the plaintiffs to complain about the judgment in post-Judgment Motions and appeal." (Emphasis added.) Microtherm concluded with the following request, "Notwithstanding, your Plaintiff respectfully asks this Honorable Court to sign and enter the proposed Final Judgment attached as Exhibit 'A.'"

Microtherm repeatedly asked the trial court to sign its proposed judgment, which recited the jury's divisible damages findings and awarded separate, several damages against each of the defendants based on the jury's findings. From the language of Microtherm's amended motion, it is clear that the "portion" of the judgment it disagreed with was not the portion of the judgment imposing liability on Dana for more than $30 million based on the jury's divisible damages findings in response to jury question number 4. Rather, Microtherm asked the trial court to enter judgment against Dana (and each of the other defendants) based on the jury's divisible damage findings.

"If a litigant is displeased with the verdict, but nevertheless moves for judgment thereon, such a motion will generally be considered an acquiescence in the verdict which will foreclose a subsequent attack on appeal; one cannot thus take inconsistent positions with regard to the correctness of judgment." *Tex. Commerce Bank Reagan v. Lebco Constructors, Inc.,* 865 S.W.2d 68, 80 (Tex. App.–Corpus Christi 1993, writ denied). Microtherm's motion did not express any disagreement with the trial court's characterization

35

of damages as divisible rather than indivisible.  In this case, Microtherm could have qualified its request for judgment accordingly with a clear reservation of its right to appeal on the question of the characterization of damages.  *See Fojtik*, 775 S.W.2d at 633.  It did not do so and is, therefore, bound by the terms of the judgment.  *See Casu*, 896 S.W.3d at 392.  Having requested entry of judgment against Dana based on the divisible damage findings of the jury, Microtherm cannot, on appeal, take a position inconsistent with its request for judgment on the basis of the divisible damages awarded and attack that part of the judgment.  *Tex. Commerce Bank Reagan*, 865 S.W.2d at 80; *see Garza*, 176 S.W.3d at 628; *Litton*, 668 S.W.2d at 321-22, 27; *accord Gammage*, 668 S.W.2d at 321-22.  We conclude, therefore, that even if the trial court erred in ruling that the damages were divisible, by requesting entry of judgment on the divisible damage findings, Microtherm abandoned its claim that the damages are indivisible and that the trial court's divisibility ruling is patently wrong.  We overrule Microtherm's cross-issue.[23]

### B.  Sufficiency of the Evidence to Support Lost Profits Award and Lost Value Award

In its third issue, Dana asserts that the separate $12.4 million lost profits damages awarded against Dana and the separate $15 million loss in value damages awarded

---

[23]Microtherm also asserts, by way of a cross-issue, that the trial court erred in refusing its requested instruction on Microtherm's lost business opportunities with DuPont, including the lost opportunity relating to the DuPont stock purchase agreement. However, the same reasoning applies to this cross-issue. Microtherm has not preserved its right to complain of the trial court's refusal to include a lost business opportunities instruction in the charge. *See Casu v. Marathon Ref. Co.*, 896 S.W.2d S.W.3d 388, 390 (Tex. App.–Houston [1st Dist.] 1995, writ denied) (citing *First Nat. Bank of Beeville v. Fojtik*, 775 S.W.2d 632, 633 (Tex. 1989) (per curiam)); *Trevino v. Espinosa*, 718 S.W.2d 848, 853 (Tex. App.–Corpus Christi 1986, no writ) ("As a general rule, an appellate court may not consider cross-points unless the appellee has in some manner apprised the trial court of [its] dissatisfaction with the judgment."). We overrule Microtherm's cross-issue regarding charge error.

against it have no support in the record.[24]  Dana contends that the evidence is legally insufficient because Microtherm failed to make any proof of separate damages to the jury. Microtherm's principal argument in response to this evidentiary challenge is that damages are indivisible, not divisible, and that it could not determine the amount of damages caused by Dana because of the combination of failures of the various component parts of the Seisco product.  However, as discussed above, Microtherm abandoned this inconsistent position when it requested judgment on the verdict, without exception, and Microtherm cannot, now, assert the same argument in support of its contentions regarding the sufficiency of the evidence of separate damages.

### 1. No Evidence of Separate Damages Caused by Dana

It is undisputed that Microtherm presented no evidence of defendant-by-defendant damages.[25]  Microtherm knew when the trial began that the case was being tried on separate damages, and Microtherm had the opportunity to present evidence of separate damages.  The trial court asked the jury to find an amount of lost profits and an amount of lost value caused by Dana, a separate amount caused by Puget, and a separate amount

---

[24]Dana challenges only the sufficiency of the evidence to support the damages awarded against it for lost profits and lost value.  Dana does not challenge the money awarded against it for the cost of repairing and/or replacing the failed thermistors or the amount awarded against it because the jury found Dana's conduct was committed knowingly.  Therefore, we address this evidentiary argument only as it relates to the jury's damage findings for lost profits and lost value.  *See* TEX. R. APP. P. 47.1.

[25]Microtherm provided testimony regarding indivisible damage amounts for lost profits and loss in value.  However, we find no testimony or other evidence regarding separate or divisible damage amounts that was admitted into evidence.  We note that, through an offer of proof on the day the case was to be argued to the jury, Seitz did testify that he could show which particular customers Microtherm lost because of each component part.  He informed the trial court of the exact percentage of lost customers due to Dana (47%), Puget (33%), and UPG (21%).  Seitz prepared an exhibit detailing the breakdown of lost customers by failures of each defendant.  Counsel for Microtherm informed the trial court that it did not have to call Seitz to testify but could, instead, offer this exhibit summarizing his testimony.  The trial court accepted the offer of proof but sustained the defendants' objections to the testimony and exhibit.  Microtherm does not challenge this ruling on appeal.

37

caused by UPG. The verdict awarded separate damages on a defendant-by-defendant basis. Yet, Microtherm did not provide any evidence as to what amount of the total damages was caused by Dana. Thus, reviewing the evidence presented at trial in the light most favorable to the jury's verdict, crediting evidence favorable to that party if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not, we conclude that the evidence was legally insufficient to support the divisible lost profit damages and the divisible lost value damages awarded against Dana. *See City of Keller*, 168 S.W.3d at 827.

### 2. Remittitur or Rendition of Judgment

Microtherm argues that, even if this Court concludes that the evidence is insufficient to support the amount of damages attributed to Dana, the most Dana would be entitled to would be a remittitur or a new trial—not a rendition of judgment. Microtherm asks us to apply the analysis utilized by the courts in *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.* and in the line of cases represented by *Texarkana Mem. Hops., Inc. v. Murdock*. *See Formosa Plastics*, 960 S.W.2d 41, 51 (Tex. 1998); *Murdock*, 946 S.W.2d 836, 839-41 (Tex. 1997); *Minn. Mining & Mfg. Co.* (*3M*) *v. Nishika LTD.*, 953 S.W.2d 733, 738-40 (Tex. 1997); *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10-12 (Tex. 1991), *modified on other grounds* by *Tony Gullo Motors I v. Chapa*, 212 S.W.3d 299, 313-14 (Tex. 2005). We decline to do so, concluding instead that such an analysis and disposition is not applicable in this case.

In *Formosa Plastics*, the court concluded that Presidio failed to present legally sufficient evidence to support the entire amount of damages—$700,000—awarded. 960

38

S.W.2d at 43, 51. The court also concluded that there was clearly legally sufficient evidence that Presidio suffered some damages as a result of Formosa's fraud, including an out-of-pocket damage award of $231,000 or a benefit-of-the-bargain damage award of $461,000. *Id.* at 51. Because there was some evidence of the correct measure of damages and because the issue of damages was contested by Formosa, the supreme court could not render judgment in favor of Presidio for a lesser amount. *Id*. Instead, the court reversed that judgment and remanded the cause for a new trial. *See id.* (citing *Murdock*, 946 S.W.2d at 841).

Even though the *Formosa* court found no evidence supporting the $700,000 fraud damages awarded against Formosa, it did find Presidio had presented some evidence of the amount of damages caused by Formosa's fraud, including the $231,000 out-of-pocket damage award and the $461,000 benefit-of-the-bargain award. *See id.* In the present case, Microtherm failed to present any evidence of the amount of damages, if any, caused by Dana, distinguishing this case from *Formosa*.

Additionally, in *Murdock, 3M*, and *Sterling*, each respective jury was asked to award indivisible damages. *See Murdock*, 946 S.W.2d at 839-41; *3M*, 953 S.W.2d at 738-40; *Sterling*, 822 S.W.2d at 10-12. The supreme court determined, in each case, that the indivisible damages could have, and therefore should have, been proven as separate or divisible damages. *See Murdock*, 946 S.W.2d at 839-41; *3M*, 953 S.W.2d at 738-40; *Sterling*, 822 S.W.2d at 10-12. In each case, the court concluded that evidence of the indivisible or total damage was evidence of the segregated or divisible damage. *See Murdock*, 946 S.W.2d at 839-41; *3M*, 953 S.W.2d at 738-40; *Sterling*, 822 S.W.2d at 10-

39

12. Each case was remanded to afford the plaintiffs with the opportunity to develop their separate damages evidence. *See Murdock*, 946 S.W.2d at 839-41; *3M*, 953 S.W.2d at 738-40; *Sterling*, 822 S.W.2d at 10-12.

In the present case, the jury was asked to award divisible or separate damages, not indivisible or total damages. And it did exactly that. Unlike *Murdock*, *3M*, and *Sterling*, where the courts remanded the cases so that the plaintiffs would have the opportunity to prove up separate damages, Microtherm had both the opportunity and the burden at trial to develop its damages—divisible among the defendants. It did not. Microtherm inexplicably offered no such proof to the jury; it provided no evidence of the divisible damages awarded. Microtherm tried its case with proof of indivisible-injury damages, but the charge required proof of divisible, defendant-by-defendant damages. Unlike the parties in *Murdock*, *3M*, and *Sterling*, Microtherm was given the opportunity and was compelled by the structure of the jury charge and prior rulings of the trial court to present evidence of divisible damages but wholly failed to do so.

We sustain Dana's third issue regarding lost profit and lost value damages awarded for Microtherm's DTPA claims.

## V. Fraud

By a sub-issue in its first issue, Dana contends that, if reached, the jury's fraud findings will not support a judgment. Because we are modifying the DTPA damage award, Microtherm may choose on remand to recover under the fraud claim based on our resolution of Dana's damage issue. *See Gunn Infiniti, Inc. v. O'Byrne*, 18 S.W.3d 715, 718 (Tex. App.–San Antonio 2000, no pet.) (remanding to permit O'Byrne to make a new

40

election of remedies (DTPA or fraud) based on the appellate court's resolution of the issues considered in the opinion). Therefore, we review Dana's challenge to the sufficiency of the evidence supporting the jury's fraud findings.

## A. Fraud Liability Findings

Jury question 9 asked, "Did any of the Defendants . . . commit fraud against Microtherm?" The charge instructed the jury as follows:

Fraud occurs when

    a.     a party makes a material misrepresentation,

    b.     the misrepresentation is made "with knowledge" of its falsity or made recklessly without any knowledge of the truth and as a positive assertion,

    c.     the misrepresentation is made with the intention that it should be acted on by the other party, and

    d.     the other party acts in reliance on the misrepresentation and thereby suffers injury.

The charge defined "[m]isrepresentation" as "a false statement of fact," "a promise of future performance made with an intent, at the time the promise was made, not to perform as promised," "a statement of opinion based on a false statement of fact," "a statement of opinion that the maker knows to be false," or "an expression of opinion that is false, made by one claiming or implying to have special knowledge of the subject matter of the opinion." The jury found that Dana committed fraud based on each definition given.

Dana contends that there is no evidence that it made representations with the intent to deceive and with no intention of performing its contract as represented. *See Formosa Plastic*, 960 S.W.2d at 47-48 (providing that the mere failure to perform a contract is not evidence of fraud; rather, the plaintiff must present evidence that the defendant made

representations with the intent to deceive and with no intention of performing as represented). Moreover, Dana asserts that there is no evidence that Dana made a material misrepresentation with knowledge of its falsity, or recklessly without any knowledge of truth, with the intention that it be acted on by Microtherm. Dana also asserts that there is no evidence that Microtherm acted in reliance on any such misrepresentation and thereby suffered injury.

We conclude, however, that the evidence discussed above is sufficient to show (1) that Dana made material misrepresentations regarding whether it was going to take, or had taken, corrective actions, (2) that Dana did so with knowledge of the falsity of those statements, (3) that Dana did so with the intent that Microtherm should act on the misrepresentation, and (4) that Microtherm relied on Dana's misrepresentations by continuing to purchase thermistors from Dana.

The jury agreed with Microtherm and found that Dana committed fraud. Considering all the record evidence in a light most favorable to Microtherm and indulging every reasonable inference deducible from the evidence in Microtherm's favor, there is more than a scintilla of evidence to support the fraud finding. *See id.* at 48. Thus, we conclude that Microtherm presented legally sufficient evidence that Dana made representations with no intention of performing as represented in order to induce Microtherm into continuing to purchase thermistors from Dana. *See City of Keller*, 168 S.W.3d at 823. Accordingly, we overrule Dana's sub-issue in its first issue that challenges the jury's fraud liability finding.

## B. Fraud Damage Findings

Furthermore, Dana incorporates its DTPA damages argument into its contention that the jury's award of divisible fraud damages against Dana, including $725,000 for lost profits

42

and $500,000 in lost value, is not supported by the evidence. We apply the same analysis to the divisible or separate fraud damage findings that we applied to the DTPA damage findings and, accordingly conclude that the evidence is legally insufficient to support the challenged award of lost profits and lost value damages against Dana resulting from fraud. *See id.* We sustain Dana's first and third issues to the extent they address fraud damages for lost profits and lost value awarded against it.

Additionally, we note that while Dana attempts to incorporate its DTPA damages argument into its contention that the jury's $250,000 award of divisible fraud damages against Dana for repair and replacement costs is not supported by the evidence, Dana addresses only lost profits and lost value in its earlier argument. Therefore, we find no argument with citations to authorities and to the record that supports this contention. *See* TEX. R. APP. P. 38.1(I) (providing that "[t]he brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"). Furthermore, Dana does not challenge the jury's finding that there was clear and convincing evidence that the harm to Microtherm resulted from the fraud found or the jury's $330,000 exemplary damages award based on the fraud findings.

## VI. Attorneys' Fees

After a hearing on attorneys' fees, the trial court ordered that Microtherm recover reasonable and necessary attorneys' fees from Dana in the amount of $12,463,485 through the trial level.[26] By its fourth issue, Dana contends that the evidence supporting the trial court's award of attorneys' fees was insufficient because the proof did not comply

---

[26]The trial court also awarded trial attorneys' fees in the amount of $10,309,058 against UPG and $7,576,055 against UPG. No appellate fees were awarded.

43

with the principles of *Arthur Andersen & Co. v. Perry Equip. Corp. See* 945 S.W.2d 812, 817-19 (Tex. 1997). In response, Microtherm contends that the evidence was sufficient because it did comply with *Arthur Andersen*.

A plaintiff who prevails in a DTPA cause of action "shall be awarded court costs and reasonable and necessary attorneys' fees." TEX. BUS. & COM. CODE ANN. § 17.50(d) (Vernon Supp. 2008). "One of the factors in determining the reasonableness of an award of attorneys' fees is the amount of damages awarded." *Allison v. Fire Ins. Exch.*, 98 S.W.3d 227, 262 (Tex. App.–Austin 2002, pet. granted, judgm't vacated w.r.m.) (citing *Wayland v. City of Arlington*, 711 S.W.2d 232, 233 (Tex. 1986) (per curiam)). This, however, is only one among many factors to consider. *See Arthur Andersen*, 945 S.W.2d at 818 (identifying the following eight factors that a trial court may consider in determining the reasonableness of an attorneys' fee award: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered); *see also Gill Sav. Ass'n v. Int'l Supply Co.*, 759 S.W.2d 697, 703-04 (Tex. App.–Dallas 1988, writ denied) (detailing twelve factors normally used in determining reasonableness of award

44

of attorneys' fees). A trial judge's decision to award attorneys' fees under the DTPA is reviewed under an abuse of discretion standard. *Bohls v. Oakes*, 75 S.W.3d 473, 480 (Tex. App.–San Antonio 2002, pet. denied); *see* TEX. BUS. & COM. CODE ANN. § 17.50(d). The factors governing the assessment of attorneys' fees are the same whether awarded by the trial court or the jury and include consideration of the "results obtained." *Young v. Qualls*, 223 S.W.3d 312, 314 (Tex. 2007) (per curiam) (quoting *Arthur Andersen*, 945 S.W.2d at 818).

In this case, the trial court found that Microtherm's attorneys' fees expert, Fred Hagans, addressed all of the elements the fact finder is asked to consider in *Andersen* and that Hagans's testimony was detailed and credible. *See Vingcard A.S. v. Merrimac Hospitality Sys., Inc.*, 59 S.W.3d 847, 870 (Tex. App.–Fort Worth 2001, pet. denied) (concluding that a jury award of dollar amount based on contingent fee, after hearing testimony, met the *Arthur Andersen* requirements). Although the trial court found "[t]hat the jury found . . . Dana . . . violated the [DTPA] and caused actual damages to Microtherm in the amount of $27,600,000," and that " based on the evidence, the elements the fact finder is asked to consider in . . . *Arthur Andersen* . . . , and the jury findings, . . . Microtherm has proven reasonable, necessary, and customary attorneys' fee[s] from . . . Dana . . . in the amount of $12,463,485," we cannot say that the attorneys' fee award of $12,463,485 million is still reasonable, given that we have significantly reduced the damages awarded by the jury. *See rePipe, Inc. v. Turpin*, 275 S.W.3d 39, 51 (Tex. App.–Houston [14th Dist.] 2008, no pet.). Taking into account the difference between the erroneous award and what we have determined is the correct award of damages, we

cannot be reasonably certain that the trial court was not significantly influenced by the erroneous damage amounts it considered. *See id.* (citing *Bossier Chrysler-Dodge II, Inc. v. Rauschenberg*, 238 S.W.3d 376, 376 (Tex. 2007) (per curiam) (explaining that if damages are reduced, attorneys' fees should ordinarily be retried unless the appellate court is "reasonably certain that the jury was not significantly influenced by the erroneous [damage award]" (quoting *Barker v. Eckman*, 213 S.W.3d 306, 314 (Tex. 2006))); *see Young*, 223 S.W.3d at 313 (per curiam) (remanding case for retrial of the attorneys' fees issues after party timely filed the suggested remittitur). We sustain Dana's fourth issue on this basis.[27]

## VII.  Charge Error

By its fifth issue, Dana complains of charge error. However, having sustained the third issue on lost profits and lost value awards, Dana's contentions regarding mitigation and probable and foreseen damages instructions are not dispositive of this appeal, and we need not address them. *See* TEX. R. APP. P. 47.1.

---

[27]Dana also challenges the sufficiency of the evidence to support the trial court's attorneys' fee award because the fees were not segregated by cause of action or by party. "[T]he party seeking recovery of attorney's fees always has the burden of proof to show that the fees were incurred against the particular defendant sought to be charged." *Au Pharm., Inc. v. Boston*, 986 S.W.2d 331, 336 (Tex. App.–Texarkana 1999, no pet.); *see Stewart Title Guaranty Co. v. Sterling*, 822 S.W.2d 1, 10-11 (Tex. 1991) ("Where a plaintiff seeks to charge multiple defendants and one or more of those defendants have settled, the plaintiff must segregate the fees so that the remaining defendants are not charged fees for which they are not responsible."). Further,

> if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. Intertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated.

*Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006). Because we are remanding the portion of the judgment awarding attorneys' fees against Dana for retrial, we need not address this issue at this time as it is not dispositive. *See* TEX. R. APP. P. 47.1.

46

## VIII.  Cross-Appellant Seitz's Individual Claims

At the close of the plaintiffs' case, the court dismissed Seitz's individual claims against Dana on Dana's motion for directed verdict.  By a cross-issue, Seitz contends that his breach of express and implied warranty claims, his DTPA claims, and his negligence claim against Dana should be reinstated.

### A.  Standard of Review

When reviewing a directed verdict on a legal issue, we consider all the evidence presented at trial, viewing it in the losing party's favor as much "as the record allows."  *S.V. v. R.V.*, 933 S.W.2d 1, 8 (Tex. 1996).  The reviewing court may affirm a directed verdict even if the trial court's rationale for granting the directed verdict is erroneous, provided it can be supported on another basis.  *Kelly v. Diocese of Corpus Christi*, 832 S.W.2d 88, 90 (Tex. App.–Corpus Christi 1992, writ dism'd w.o.j.).

### B.  Breach of Express and Implied Warranty Claim

Although not a party to a contract with Dana, Seitz contends that he, in his individual capacity, should recover economic loss from Dana for breach of the express and implied warranties of merchantability and fitness associated with Dana's thermistors.  Dana asserts that because Seitz is in "horizontal privity," he cannot claim economic losses resulting from a breach of warranty.  Under the facts of this case, we agree.

There are two types of privity of contract, vertical and horizontal.  "Vertical privity" includes all parties in the distribution chain from the initial supplier of the product to the ultimate purchaser.  *Garcia v. Tex. Instruments, Inc.*, 610 S.W.2d 456, 463-64 (Tex. 1980).  "Horizontal privity" is described as the relationship between the original supplier and any non-purchasing party who uses or is affected by the product, such as the family of the

47

ultimate purchaser or a bystander. *Id.* The Texas Legislature "has delegated the question of privity to our courts." *Id.* at 464-65; *see* Tᴇx. Bᴜs. & Cᴏᴍ. Cᴏᴅᴇ Aɴɴ. § 2.318 (Vernon 2009) (providing that this chapter is neutral on need for privity of contract). "Two preeminent Texas Supreme Court cases have addressed who may sue for breach of implied warranty other than the immediate purchaser of a product." *Hou-Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103, 108 (Tex. App.–Houston [14th Dist.] 2000, no pet.).

In *Nobility Homes of Texas, Inc. v. Shivers*, a case of vertical privity, Shivers, the owner of a defective mobile home, sued its manufacturer *for economic loss under an implied warranty.* 557 S.W.2d 77, 77 (Tex. 1977). Although Shivers was not the direct purchaser from the manufacturer of the mobile home, he was the ultimate purchaser in the distribution chain. *See id.* The supreme court held "that a manufacturer can be responsible, without regard to privity, for the *economic loss* which results from his breach of the Uniform Commercial Code's implied warranty of merchantability." *Id.* at 81 (emphasis added).

In addition, this Court has held direct privity is not necessary when there is vertical privity in a suit *for economic loss under an express warranty.* In *Crosbyton Seed Co. v. Mechura Farms*, we held that direct privity was not necessary where the seed company knew it was selling to a middleman, knew that the ultimate buyer was getting some of the seed, and the "bag tag" constituted an express warranty. 875 S.W.2d 353, 361 (Tex. App.–Corpus Christi 1994, no writ). Earlier, in *National Bugmobiles, Inc. v. Jobi Properties*, we concluded that no direct privity was required where an exterminator made a "perpetual, freely transferable express written warranty" knowing that the exterminated house may be sold, thus, extending the warranty to the buyers of the house. 773 S.W.2d 616, 622 (Tex.

48

App.–Corpus Christi 1989, writ denied); *see U.S. Tire-Tech, Inc. v. Boeran*, 110 S.W.3d 194, 198 (Tex. App.–Houston [1st Dist.] 2003, pet. denied) (op. on rehr'g) (holding in a vertical-privity-DTPA-breach-of-express-warranty case, "that [direct] privity of contract is not required in order to sustain a breach of express-warranty claim for purely economic losses").

The Texas Supreme Court has also extended responsibility *for personal injuries* resulting from *an implied breach of warranty* under the UCC where there is horizontal privity. In *Garcia v. Texas Instruments, Inc.*, Garcia suffered severe acid burns when he tripped at work while carrying containers of concentrated sulphuric acid. 610 S.W.2d at 457. Garcia's employer purchased the sulphuric acid from Texas Instruments. *Id*. Garcia sued Texas Instruments alleging breach of the implied warranty of merchantability. *Id*. The supreme court concluded that, through Garcia's employer, there was a relationship between the non-purchasing employee who was affected by the product and Texas Instruments. *See id.* at 463-65. Applying the same factors it had utilized in rejecting privity as a requirement in actions based on strict liability in tort, the *Garcia* Court reasoned that,

> [t]here is no adequate rationale or theoretical explanation why non-users and non-consumers should be denied recovery against the manufacturer of a defective product. The reason for extending the strict liability doctrine to innocent bystanders is the desire to minimize risks of personal injury and/or property damage. A manufacturer who places in commerce a product rendered dangerous to life or limb by reason of some defect is strictly liable in tort to one who sustains injury because of the defective condition. . . .

*Id.* at 465 (quoting *Darryl v. Ford Motor Co.*, 440 S.W.2d 630, 633 (Tex. 1969)). In *Garcia*, the supreme court held that "privity of contract is not a requirement for a uniform-commercial-code-*implied-warranty* action for personal injuries." *Id.* (emphasis added).

49

Seitz, however, is not in vertical privity, and he is not suing for physical injury. Therefore, his warranty claims differ from the plaintiffs' claims in *Nobility Homes* and *Garcia.* Moreover, Texas courts have not extended liability in a breach-of-warranty case where a party in horizontal privity sues a seller for only economic damages. *See Hou-Tex*, 26 S.W.3d at 109; *see also Keith v. Stoelting, Inc.*, 915 F.2d 996, 999 (5th Cir. 1990) (per curiam) (interpreting Texas law and holding, in a case where a state employee sued the polygraph manufacturer after he failed a polygraph test and lost his job, that "Texas will not extend horizontal privity to economic loss cases. . . ."). *But see Kaiser Aluminum & Chem. Sales, Inc. v. PPG Indus,, Inc.*, No. IP 91-367-C, 1992 WL 695317, at *3 (S.D. Ind. 1992), *aff'd*, 42 F.3d 1147 (7th Cir. 1994) (concluding, in light of *Nobility*'s holding that privity is not a requirement for the UCC implied warranty action for economic loss, "because there is no privity requirement for implied warranty of merchantability actions under Texas law, PPG is not entitled to judgment on Kaiser's merchantability warranty claim"). We are guided by the reasoning in *Hou-Tex.* 26 S.W.3d at 108-09.

Specific to the facts of this case, it is undisputed that Seitz, in his individual capacity, owns the patents for the technology in question and that he has a licensing agreement with Microtherm whereby he is to be paid 4% of every sale as a royalty. Seitz asserts that Dana's breach resulted in his economic loss, as the patent owner and licensor, because (1) his patents lost value precluding him from licensing them on a global basis, and (2) he lost royalties as a consequence of a reduction in the sale of the Seisco water heater. However, Seitz never bought, used, or possessed Dana's thermistors. Instead, Microtherm purchased the thermistors from Dana. Further, Microtherm licensed Seitz's patents and

50

profited from the patent technology. The related profit or loss, if any, filtered through Microtherm, not Dana. Seitz attempts to leap-frog over Microtherm to impose liability on Dana, with whom Seitz had no patent relationship whatsoever. Seitz, in his individual capacity, is solely affected by Dana's product through his licensing arrangement with Microtherm, the direct purchaser or user of the defective product. We cannot conclude that Seitz is among those in horizontal privity who can sue for economic loss caused by Dana's breach of express or implied warranty.

As expressed by the Houston court in *Hou-Tex*, while we must exercise caution in making further extensions of the requirement of privity between the plaintiff and the product seller in breach of express or implied warranty claims, "[w]e must also be cautious in creating a rule that disallows claims not at issue in this case." 26 S.W.3d at 109. Therefore, today we do *not* hold "that all parties in horizontal privity with the seller are disallowed from suing for economic loss caused by breach of [express or] implied warranty." *Id.* Rather, considering all the evidence presented at trial and viewing it in Seitz's favor as much "as the record allows," under the specific facts of this case, we conclude that Seitz cannot maintain an action against Dana for breach of express or implied warranty. The trial court's directed verdict on Seitz's warranty claim can be supported on this basis. *See S.V.*, 933 S.W.2d at 8.

## C. DTPA Claim

Seitz also contends through his cross-issue that he is qualified as a consumer and, therefore, his DTPA claim against Dana should be reinstated. In order to invoke the DTPA, one must be a "consumer," defined as "an individual . . . who seeks or acquires by purchase or lease, any goods or services." TEX. BUS. & COM. CODE ANN. § 17.45(4)

51

(Vernon Supp. 2008). In determining whether a plaintiff is a consumer, the focus is on the plaintiff's relationship to the transaction, not on the plaintiff's contractual privity, if any, with the opposing party. *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 650 (Tex. 1996) (determining that the court must examine whether a manufacturer's conduct occurred in connection with the plaintiffs' purchases of their homes). A third-party beneficiary may qualify as a consumer as long as the transaction was specifically required by or intended to benefit the third party and the good or service was rendered to benefit the third party. *Arthur Andersen*, 945 S.W.2d at 815 (holding "consumer" includes intended beneficiary of goods or services); *Kennedy v. Sale*, 689 S.W.2d 890, 892 (Tex. 1985) (concluding that the employees were the primary intended beneficiaries of an insurance policy purchased by their employer and, therefore, were consumers); *Birchfield v. Texarkana Mem'l Hosp. d/b/a Wadley,* 747 S.W.2d 361, 364, 368 (Tex. 1987) (holding that a premature infant acquired goods and services sold by a hospital, regardless of the fact that she did not contract for them). However, incidental beneficiaries of goods or services do not qualify as DTPA consumers. *See Vinson & Elkins v. Moran*, 946 S.W.2d 381, 407-08 (Tex. App.–Houston [14th Dist.] 1997, writ dism'd by agr.) (concluding that will beneficiaries injured by the estate counsel's legal malpractice were incidental beneficiaries and not DTPA consumers); *Banzhaf v. ADT Sec. Sys. Sw., Inc.*, 28 S.W.3d 180, 187 (Tex. App.–Eastland 2000, no pet.) (holding that an employee was not a DTPA consumer of an alarm system purchased by the employer for the protection of the employer's premises at night); *Brandon v. Am. Sterilizer Co.*, 880 S.W.2d 488, 492 (Tex. App.–Austin 1994, no writ) (holding that a hospital employee injured by a defectively repaired gas sterilizer was only an incidental beneficiary and, therefore, not a consumer). Although the DTPA is to

be interpreted liberally, *see Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 541 (Tex. 1981), we are not persuaded that the Texas Legislature intended the DTPA to apply to causes of action by patent owners and licensors against manufacturers who provide parts to the licensee company for the technology in question. *Cf. Moran*, 946 S.W.2d at 407 (stating that the court was not persuaded that the Texas Legislature intended the DTPA to apply to causes of action by will beneficiaries against the attorneys hired by the executors of the estate).

The relevant issue in determining whether a party is a consumer for purposes of bringing a DTPA claim is the purpose behind the purchases of the goods or services. *Id.* at 408 (citing *Brandon*, 880 S.W.2d at 492); *see also Arthur Andersen*, 945 S.W.2d at 815. While an employee is entitled to consumer status when the goods or services are purchased for the primary purpose of benefitting the employee, when the goods or services are purchased for the primary purpose of benefitting the business, and any use or benefit of those products extends to the employee only incidentally, the employee does not have standing to sue under the DTPA. *Moran*, 946 S.W.2d at 408 (citing *Brandon*, 880 S.W.2d at 492).

Similarly, in this case, it was the company, not Seitz in his individual capacity as the owner and licensor of the patents, that purchased the component parts from Dana. Microtherm's purpose in purchasing the thermistors was to build tankless water heaters. Any benefit of these purchases would obviously extend to Seitz as the patent holder who would receive royalties and, arguably, an increased value to the patents if the performance of the Seisco was successful. *See id.* Any benefit derived by Seitz as the patent owner and licensor, however, was merely incidental to the main purpose, i.e., manufacturing a

53

tankless water heater. *See id*. We cannot conclude that Microtherm purchased thermistors from Dana for the principal purpose of providing a benefit to Seitz. In this and other instances, the fortunes of third parties are affected by the sale of a product. *See id.* The mere fact that these third parties are benefitted by the performance of a component part in the manufactured product or incidentally damaged by the sales performance of the manufactured product because of a failed component part does not provide the third-parties consumers with rights to an action under the DTPA. *See id.* Third parties with ownership in patents relevant to this technology are "incidental beneficiaries," and we do not believe the legislature intended to confer consumer status on them. Thus, we conclude Seitz, individually, was not a consumer and was not entitled to bring an action under the DTPA. The trial court's directed verdict on Seitz's DTPA claim was appropriate on this basis.

### D. Negligence Claim

Finally, Seitz contends that he has a valid claim against Dana for injury to his patents based on their loss in value allegedly caused by Dana's negligence in providing defective thermistors to Microtherm. "Texas courts have applied the economic loss rule to preclude tort claims between parties who are not in contractual privity." *City of Alton v. Sharyland Water Supply Corp.*, 277 S.W.3d 132, 152 (Tex. App.–Corpus Christi 2009, pet. filed) (op. on rehr'g) (quoting *Sterling Chems., Inc. v. Texaco Inc.*, 259 S.W.3d 793, 797 (Tex. App.–Houston [1st Dist.] 2007, pet. denied)). "'Economic loss' has been defined as 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property. . . .'" *Id.* (quoting *Thomson v. Espey Huston & Assocs.*, 899 S.W.2d 415, 421

(Tex. App.–Austin 1995, no writ)).  In tort cases where there is an absence of privity of contract, economic damages are not recoverable unless they are accompanied by actual physical injury or property damage.  *See City of Alton*, 277 S.W.3d at 152-53 (citing *Express One Int'l, Inc. v. Steinbeck*, 53 S.W.3d 895, 899 (Tex. App.–Dallas 2001, no pet.); *Coastal Conduit & Ditching, Inc. v. Noram Energy Corp.*, 29 S.W.3d 282, 288-89 (Tex. App.–Houston [14th Dist.] 2000, no pet.); *Hou-Tex*, 26 S.W.3d at 107).

In this case, Seitz and Dana were not in contractual privity.  Seitz seeks compensation only for economic damages—the loss in value of his patents.  Because Seitz has not identified any physical injury or property damage that he has sustained as a result of defective products provided by Dana, we conclude that the economic loss rule bars Seitz's negligence claim against Dana.  The trial court's rationale for granting the directed verdict on Seitz's negligence claim can be supported on this basis.  *See Kelly*, 832 S.W.2d at 90.

Accordingly, we overrule Seitz's sole cross-issue.

## IX.  Conclusion

We affirm the portion of the trial court's judgment regarding liability; modify the judgment to reflect a damage award against Dana in the amount of $200,000 in actual damages and $250,000 in additional damages and affirm that portion of the judgment as modified; and reverse the portion of the judgment awarding attorneys' fees against Dana and remand the case for retrial of that issue.  In addition, Microtherm elected to recover under the DTPA claims based on damages recovered.  On remand, Microtherm should be given the opportunity to reconsider its election in light of our analysis.  *See Gunn Infiniti*, 18 S.W.3d at 718.

55

We also affirm the trial court's directed verdict entered in favor of Dana and against Seitz, individually.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the 21st
day of January, 2010.